## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION
## CASE NO. 5:09-CV-00044-R

THOMAS E. FENSKE, et al.                                                              PLAINTIFFS

v.

JOHN R. ODDO, et al.                                                                   DEFENDANTS

## MEMORANDUM OPINION

This matter comes before the Court upon Defendants' Renewed Motion for Summary Judgment (DN 26). Plaintiff has responded (DN 33). This motion is now ripe for adjudication. For the reasons that follow, Defendants' Motion for Renewed Summary Judgment is DENIED. In the alternative, Defendants make a Motion for Partial Summary Judgment regarding certain claims, as the damages cited by the Plaintiffs are speculative and because the Plaintiffs have spoliated evidence. For the reasons that follow, Defendants' Motion for Partial Summary Judgment is GRANTED.

## BACKGROUND

This action arises out of Thomas E. Fenske and Sue Moore Fenske's ("Fenskes" or "Dr. Fenske" or "Ms. Fenske") purchase of a house in Paducah, Kentucky, located at 233 Valley Road ("the Valley Road House") from John R. Oddo and Sandra M. Oddo ("Oddos"). The Fenskes filed suit against the Oddos in McCracken County Circuit Court, whereafter the Oddos removed the case to the Western District of Kentucky. DN 1 at 1. The Fenskes allege against the Oddos negligence, negligent misrepresentation, fraudulent misrepresentation, breach of contract, and breach of warranty.

The undisputed facts surrounding the Fenskes' claims are as follows. The Oddos purchased the Valley Road House on July 31, 2006. Before their purchase, the Oddos contracted

a home inspector; in his report, the inspector reported that there was some moisture damage in the basement and recommended that a licensed contractor review the basement prior to closing. DN 33-2 at 12. Additionally, in a written form describing the property, the sellers disclosed to the Oddos that the basement leaked in very heavy rain. DN 17-4 at 2.

During their thirteen month ownership of the house, the Oddos made a number of improvements, including repairing and updating gutter drain pipes, paving the driveway, painting the basement, and repairing the floor in the basement, among other things. Additionally, the Oddos requested that the City of Paducah "remove gravel from the ditch in front of the house which blocked drainage from the street and caused water to run across the yard." DN 11 at 7. Finally, the Oddos replaced a broken tile and drain in the patio and driveway to correct a drainage problem.[1] The Oddos replaced the broken tile themselves, renting a back hoe and cut-off saw to remove the asphalt and brick that obstructed the defective tile. During their time in the Valley Road House, the Oddos claim that they never experienced any kind of water seepage or leakage into the basement.

On August 29, 2007, the Oddos sold the Valley Road House to the Fenskes. In the negotiations and mandated disclosures between the parties prior to closing, the Oddos warranted through contract that there existed no latent defects with the house and denied knowledge of any drainage, flooding, or grading problem. The Fenskes also contracted a licensed home inspector to examine the house. During his inspection, which both the Fenskes and Oddos attended, the inspector noted that the improvements to the basement by the Oddos obscured the original basement walls, floors and ceilings and therefore they were excluded from the inspection.

---

[1] According to the Oddos, "[a] grated drain was installed outside the family room door to prevent water from collecting on the patio." DN 11 at 7.

However, the inspector did notice evidence of past water damage on a door frame in the basement as well as mildew in a closet. In his report, the inspector recommended review by a "qualified professional." DN 12-5 at 2. Immediately after this inspection, the Oddos assured the Fenskes that they had never experienced water leakage in the basement.

In February of 2008, following a severe snow and ice storm, the Fenskes discovered leakage and moisture in the basement of the Valley Road House. The Fenskes claim that water infiltration has continued since that date whenever there is precipitation. On February 25, 2009, the Fenskes filed this action against the Oddos asserting the above stated causes of action. The Fenskes seek damages with regard to (1) the cost to repair the basement (2) the storage costs incurred following the damage to the basement (3) the loss of use of the portion of house that was affected by the leakage (4) the loss of business income for the Fenskes' engineering business and (5) the loss of Dr. Fenske's engineering data destroyed by the leakage. Dr. Fenske's engineering data was on paper files and stored in cardboard boxes in the basement. Dr. Fenske disposed of the damaged work papers before the Oddos or their legal counsel could inspect them because he claims the papers were ruined and smelling. DN 28 at 91.

In this Motion for Full and Partial Summary Judgment, the Oddos claim that they are entitled to full summary judgment as the rule of *caveat emptor* precludes the Fenskes' claims and because the Fenskes have not produced sufficient evidence to support their claims. In the alternative, the Oddos allege they are entitled to partial summary judgment as to the loss of Dr. Fenske's engineering data and the loss of business income because these damages claims are speculative and because the Fenskes have spoliated evidence of these damages.

**STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### I. Motion to for Summary Judgment

Where jurisdiction is exercised on diversity of parties, the substantive law of Kentucky governs the dispute. *Rutherford v. Columbia Gas*, 575 F.3d 616, 623 (6th Cir. 2009). Kentucky applies the rule of *caveat emptor*, the general rule that "real estate is sold in an 'as is' condition and all prior statements and agreements, written and oral, are merged into the deed of

conveyance, and the purchaser takes the property subject to the existing physical condition."
*Ferguson v. Cussins*, 712 S.W.2d 5, 6 (Ky. Ct. App. 1986). Kentucky recognizes certain exceptions to the rule. One exception is where the defective condition in the property is inherently nonobservable. *Id*; *see Borden v. Litchford*, 619 S.W.2d 715, 717 (Ky. Ct. App. 1981). Another exception is where there is fraudulent concealment on the part of the seller. *Bryant v. Troutman*, 278 S.W.2d 918, 920 (Ky. 1976).

The Fenskes allege that the rule of *caveat emptor* does not apply for three reasons: (1) the defective condition of the basement leakage was inherently nonobservable as a result of the Oddos' remodeling (2) the Oddos fraudulently concealed the leakage in the basement from the Fenskes and (3) the Oddos' negligent construction of the drainage system on the back patio is a claim the Fenskes can assert apart from the sale of the home and therefore the rule of *caveat emptor* does not apply. This Court addresses each in turn.

The inherently-nonobservable exception does not apply to the current facts. In *Ferguson v. Cussins*, the Kentucky Court of Appeals applied this exception where the seller of a service station misrepresented the condition of underground gasoline tanks. *Ferguson*, 713 S.W.2d at 6. In *Grant v. Wrona*, the same court held that rotting joists under a house were not discoverable through ordinary diligence because the joists were only accessible through a crawl space under the house. *Grant v. Wrona*, 662 S.W.2d 227, 230 (Ky. Ct. App. 1983). Unlike in *Ferguson* and *Grant*, not only did the Fenskes have easy access to the basement and the structure surrounding the basement, but past water seepage into the basement was observable before the Fenskes' purchase of the house. In his report to the Fenskes, the home inspector noted that there was already water and mildew damage to parts of the basement. DN 12-5 at 2. Furthermore, in his deposition, Dr. Fenske states that he inquired about the water damage after he observed it during

the inspection.[2]  DN 28 at 27-28.  Consistent with past Kentucky decisions, this Court construes the inherently-nonobservable exception to *caveat emptor* as a question of access to the defect rather than concealment as the Fenskes contend.  Since the Fenskes had access to basement and did observe evidence of some water damage, this exception to *caveat emptor* does not apply.

The fraudulent concealment exception to *caveat emptor* applies where the seller intentionally suppresses facts concerning a defect that is known to the seller and unknown to the buyer.  *Bryant*, 287 S.W.2d at 920.  The seller must also know that the actions of the buyer are predicated on the assumption that the defect does not exist.  *Id*; *Flora v. Morris*, No. 02-1692, 2003 WL 21476115, at *2 (Ky. Ct. App. June 27, 2003).  Finally, "[t]he party alleging fraud has the burden to establish it by clear and convincing evidence."  *Alvey v. Union Inv., Inc.*, 697 S.W.2d 145, 147 (Ky. Ct. App. 1985) (quoting *Wahba v. Don Corlett Motors, Inc.*, 573 S.W.2d 357 (Ky. Ct. App. 1978); *see Ross v. Powell*, 206 S.W.3d 327, 330-31 (Ky. 2006).

The Fenskes admit that they have no direct evidence that the Oddos fraudulently concealed the leakage problems of the basement.  *See* DN 27 at 30; DN 28 at 73-78.  However, past Kentucky case law allows for circumstantial evidence to create the basis of the fraudulent concealment exception in the sale of real estate.  *Grant*, 662 S.W.2d at 230.  In *Grant*, clear and convincing evidence for the fraudulent concealment exception existed where despite the seller's contention that the wood siding of a house was in "excellent condition," the buyer's expert witness was able to insert a knife into the siding with little effort.  *Id*. at 229.  The condition of the rotting wood had been concealed by a fresh coat of paint.  *Id*.  With those facts, the Kentucky court stated that a "jury could reasonable infer from the evidence of the condition of the wood

---

[2] While Dr. Fenske's observation of the water damage in the basement may foreclose the inherently-nonobservable exception, it has no bearing on whether the Oddos fraudulently concealed the leakage in the basement.

presented by the [buyer and her expert witness] and the fact that it had been painted very recently by the [seller] . . . that the [seller] knew of the defective condition despite her protests to the contrary." *Id.*

To demonstrate clearly and convincingly that the Oddos fraudulently concealed past water leakage and seepage into the basement, the Fenskes rely on several pieces of circumstantial evidence: (1) the Oddos' home inspection noted water damage on the walls and ceilings of the basement (2) the seller's disclosure form that the Oddos received in their purchase of the Valley Road House discussed the infiltration of water into the basement during times of heavy precipitation (3) the scope of the water leakage into the basement during and after the storm in February of 2008 was too severe for the Oddos never to have experienced it and (4) the Oddos misstated on their seller's disclosure form to the Fenskes that they had not made repairs to the basement. DN 33 at 31-33. This Court feels that the Fenskes have carried the burden required according to the summary judgment standard. Examining the evidence in a light most favorable to the Fenskes, documentation in the Oddos possession demonstrated past leakage or seepage problems with the basement. Additionally, that the Oddos made substantial improvements on the basement during their ownership, the damage noted by the first home inspection would have been readily apparent to them. Lastly, the scope of the infiltration of water into basement does create the reasonable, circumstantial inference that the Oddos observed the Valley Road House's water problems during their ownership.[3] Much like *Grant*, a jury could reasonably infer from this evidence that the Oddos knew of the defective condition in the Valley Road House and concealed it from the Fenskes prior to their purchase. For this reason, summary

---

[3] Examining the evidence in the most favorable light to the Fenskes, Ms. Fenske testified that every time it rained, water leaked into the basement. DN 27 at 52.

judgment would be inappropriate. *See CMACO Automotive Sys., Inc. v. Wanxiang America Corp.*, 589 F.3d 235, 242 (6th Cir. 2009) (stating that summary judgment is inappropriate when sufficient evidence exists such that a reasonable jury could find for the non-moving party).

The Fenskes state that the Oddos' work on the rear patio was negligently performed and this separate claim falls outside the rule of caveat emptor. Given the decision that the rule of *caveat emptor* does not bar the Fenskes' claim, this Court need not decide this issue.

The Oddos also argue that they are entitled to summary judgment because the Fenskes have not produced evidence to support their claims. As previously stated, this Court believes that the Fenskes have produced evidence to demonstrate a genuine issue as to the specific facts essential to their case. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990). The Oddos are incorrect in their assertions that there is no evidence showing they were aware of water seepage into the house.

For the above stated reasons, the Fenskes have provided sufficient evidence to show that *caveat emptor* does not preclude their claims. As such, the Oddos are not entitled to summary judgment.

### II. Motion for Partial Summary Judgment

The Oddos alternatively maintain that they are entitled to partial summary judgment with regard to the lost business income of Fenske Engineering and damage to certain engineering data produced by Dr. Fenske. Each is examined in turn.

**a. Lost Business Income of Fenske Engineering**

The Fenskes allege that the damage done to their basement has interfered with Fenske Engineering, a business they previously ran from a basement office. Since the damage, the Fenskes have moved their business into the dining room of their house. The Fenskes now claim

damages for the lost profits the Fenskes would have earned had they been able to use the office in the basement.[4]

Kentucky law requires that lost profits be established with reasonable certainty. *Pauline's Chicken Villa, Inc. v. KFC Corp.*, 701 S.W.2d 399, 401 (Ky. 1985). However, lost profits are not recoverable where they are "based upon sheer speculation and guesswork." *Riverside Coal Co. v. United Mine Workers of America*, 410 F.2d 267, 274 (6th Cir. 1969) (applying Kentucky law). Factors and elements that help a party demonstrate the reasonable certainty of lost profits in past cases include how long the business had been in operation, whether the business had ever generated a profit, and how strong of a factual showing there was to indicate that the business could in fact operate at a profit. *See Compressed Gas Corp. v. United States Steel Corp.*, 857 F.2d 346, 353 (6th Cir. 1988) (applying Kentucky law).

From the allegations and evidence before the Court, it is clear that there inadequate proof to show that the damages to the basement caused Fenske Engineering to lose profits. "In order to be a legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent." *Flegles, Inc. v. Truserv Corp.*, 289 S.W.3d 544, 553 (Ky. 2009). Here, for the Fenskes to show causation with regard to the lost profits, the acts of the Oddos must be a "substantial factor" in bringing about the lost profits. *See id.* Kentucky law asserts that to be a substantial factor, "the defendant's conduct has [to have] such an effect in producing the harm as to lead reasonable men to regard it as a cause." *Id.* While the Fenskes have provided projections of earnings of their business, no evidence advanced in these motions actually demonstrates that any damage befell Fenske Engineering by denying it access to the

---

[4] This Court does not address the damage claims to the property of Fenske Engineering, only the lost profits for the business.

basement office.  *See* DN 28 at 62.  In his deposition testimony, Dr. Fenske stated:

> Question: You are working from the dining room table?
> Dr. Fenske's Answer: Dining room table and the living room floor, yeah.
> Q: And had you been working out of an office in the basement, you feel you would have made [the projected lost profits]?
> A: I don't know.  We - we would have come close, I would anticipate that.

DN 28 at 62.  Dr. Fenske cannot enumerate any specific business opportunities that were foreclosed as a result of not being able to use the basement office; instead, he simply alleges that Fenske Engineering would have been profitable if the office had been available to receive potential clients.  DN 28 at 8.  Nevertheless, it is clear from his testimony that Fenske Engineering did in fact have a location in which it could meet with clients - the dining room.  Dr. Fenske even admits that he did meet clients in his dining room for business-related discussions, undercutting the primary basis for the lost profits claim.  DN 28 at 9.  While the dining room was not the location the Fenskes originally had planned on using to run their business, operating in the dining room as opposed to the basement office failed to cause any of the lost profits that the Fenskes claim.

Notwithstanding that the Fenskes cannot prove the necessary element of causation, their claim of lost profits is too speculative to be recoverable.  In Dr. Fenske's testimony, he offers that at the time of the initial water damage, Fenske Engineering was only in its infancy - the office downstairs had just been organized, Fenske Engineering had yet to be incorporated, and the business plan Dr. Fenske had created had yet to be implemented.  DN 28 at 5.  His deposition testimony further indicates that the business generated less than $10,000 in gross revenue in 2009, the year of the water infiltration.  DN 28 at 63.  Applying the factors set forth in *Compressed Gas Corp.* to Fenske Engineering, the business has no established track record, earned less that $10,000 in 2009, and had not a single project or client capable of creating the

type of revenue stream the Fenskes set forth in their projections. Finally, this Court has serious doubts concerning the method by which the Fenskes have created the profitability estimates of Fenske Engineering. In her testimony, Ms. Fenske said that the figures she created to demonstrate the business' potential revenue stream were based on Dr. Fenske's past salary in the late 1980s and early 1990s when he was "traveling the world" as a consultant. DN 27 at 64-65. As the evidence clearly puts forward, Dr. Fenske is no longer consulting throughout the globe and instead working almost exclusively in Western Kentucky. DN 28 at 8. As such, it is highly dubious that the projections for Fenske Engineering accurately depict the proper earnings figures.[5] In light of this evidence, this Court agrees that there has been no showing that Fenske Engineering could have operated at a profit, and thus the damages claim is speculative.

For these reasons, summary judgment on the claim for the lost profits of Fenske Engineering is appropriate.

**b. Dr. Fenske's Engineering Data and Studies**

The Fenskes allege that the water infiltration of the basement destroyed two engineering studies by Dr. Fenske. In one study involving research from Queensland, Australia ("Queensland Study"), Dr. Fenske investigated bridge fluid dynamics. According to documents before this Court, Dr. Fenske was able to reach a "preliminary conclusion to an engineering mystery" in the Queensland Study. DN 33 at 15. In the other study, Dr. Fenske worked on issues relating to the Big Four Pedestrian Bridge in Louisville ("Big Four Study"). The

---

[5] This Court recognizes the accepted principle that "[q]uestions raised concerning damages are essentially questions of fact." *Duty v. U.S. Dep't. of Interior*, 735 F.2d 1012, 1014 (6th Cir. 1984); *see Tenn. Gas Transmission Co. v. Teater,* 252 S.W.2d 674, 676 (Ky. 1952). While generally the accuracy of damages calculations are a jury issue, this court cites Ms. Fenske's calculations instead to demonstrate the sheer speculation of the claim for Fenske Engineering's lost profits.

approximate worth of this personal property according to the Fenskes is $100,000 for the Queensland Study and $45,000 for the Big Four Study. Dr. Fenske states that the $145,000 figure is an estimation based upon his expenditures on the projects and the costs it would take to recreate the destroyed data. Dr. Fenske admits he has no documentation that accurately set forth his expenditures with regard to either of the projects. Furthermore, while Dr. Fenske insinuates that some of the data had practical implications that would yield great dividends for his business, he is unable to point to any particular business venture or opportunity that was lost because this data was unavailable.

Kentucky law requires that damages be proven with reasonable certainty and speculative damages may not be recovered. *Curry v. Bennett*, 301 S.W.3d 502, 506 (Ky. Ct. App. 2009). However, "where it is reasonably certain that damage has resulted, mere uncertainty as to the amount does not preclude one's right of recovery or prevent a jury decision awarding damages." *Id.* Kentucky law asserts that "the proper measure of damages for injury to personal property is the difference in the fair market value of the property before and after the accident." *McCarty v. Hall*, 697 S.W.2d 955, 956 (Ky. Ct. App. 1985). Fair market value is "the price that a willing seller will take and a willing buyer will pay for property, neither being under any compulsion to sell or buy." *Cent. Ky. Drying Co. v. Commonwealth, Dept. of Hous., Bldgs. & Constr.*, 858 S.W.2d, 165, 167 (Ky. 1993).

Concerning the Queensland Study, this Court believes that putting a fair market value on a "preliminary conclusion to an engineering mystery" is impossible. Dr. Fenske admits that the work on the Queensland Study has never produced any commercial or business opportunities and that he no longer has any supporting documentation as to expenses, the time he spent on the study, or even what the study said. Dr. Fenske also admits that this study was not actually

complete and in the end the study would serve primarily to attract business to Fenske Engineering.  Finally, while the Fenskes multiply the standard billing rate of Dr. Fenske by the amount of time it would take to recreate the data, they cite no authority for concluding that this is proper way to determine the value of the data.  In valuing this unpublished study, the primary value of which lies only in increasing Dr. Fenske's notoriety, a jury would be force to "indulge in speculation and guesswork as to the probable damages," which is expressly prohibited by Kentucky law.  *Louisville & N.R. Co. v. Lankford*, 200 S.W.2d 297, 298 (Ky. 1947).  With regard to the Big Four Study, Dr. Fenske's claims for damages are similarly illusory.  Dr. Fenske testified as follows in a deposition:

> Question: And how did you come up with the $45,000 as being the value of the [Big Four Study]?
> Dr. Fenske's Answer: Because that one I have somewhere on the length of time it would take me to replace the calculation.
> Q: And why do you need to replace the calculation?
> A: Because I'm responsible for the substructure.  My stamp is on [the bridge] and the bridge is there.
> Q: So you need it in case you need to recreate that information in case it is needed at some point in the future?
> A: Absolutely.
> ...
> Q: Okay. So the only reason you need this data is in case somebody calls it into question -
> A: Yeah.

DN 28 at 88.  Notwithstanding that no documentation exists to support the proposed valuation of the data, Dr. Fenske's testimony demonstrates that he would be damaged by not having the Big Four Study *only if* he was called upon to produce it in the future.  Moreover, Dr. Fenske admits that the primary responsibility for designing the pedestrian bridge fell to Geotech, his former employer.  DN 12-2 at 12.  It would appear that this past employer, and not Dr. Fenske, would bear much of the responsibility in producing the documentation surrounding the Big Four Pedestrian Bridge should it ever be requested.  Consequently, this Court believes the Fenskes

cannot prove with reasonable certainty that they have been damaged by the destruction of the Big Four Study. *See KFC Corp.*, 701 S.W.2d at 401-02.

Even if the Fenskes' damage claims relating to the Big Four Study and the Queensland Study were not overly speculative, the Fenskes' spoliation of the evidence justifies partial summary judgment in favor of the Oddos. Trial courts have broad discretion when determining the proper sanction to impose on parties when evidence is spoliated. *Adkins v. Wolever*, 554 F.3d 650, 653 (6th Cir. 2009). In determining the remedy for spoliation, "courts generally consider whether the spoliation was prejudicial, whether it can be cured, the importance of the missing evidence, whether the spoliating party was acting in good faith or bad faith, and the deterrent effect of the remedy compared with a lesser sanction." *KCH Services, Inc. v. Vanaire, Inc.*, No. 05-777, 2009 WL 2216601, at *2 (W.D. Ky. July 22, 2009). The Fenskes destroyed all documents related to the personal engineering studies of Dr. Fenske, knowing that there were no copies available. Not only do the two studies constitute the bulk of the Fenskes' damages claims, but these claims are very difficult to value. Indeed, the Oddos are severely prejudiced by the premature disposal of the documents as the only way they could have undermined the Fenskes' valuation claims would have been to have qualified experts examine the studies and to present that evidence at trial. That is now impossible. The evidence also shows that the Fenskes disposed of the data after they began contacting the Oddos in hopes of seeking redress for the seepage into the Valley Road House. In spite of all this, the Fenskes discarded the data without allowing the Oddos to examine it or even informing the Oddos of their plans.

While the Fenskes claim that keeping the studies in their house increased the risk of

triggering their son's asthma and attracting spiders, the Court finds this reasoning unpersuasive.[6]

In light of all these facts, summary judgment with regard the claims surrounding the Queensland Study and the Big Four Study is appropriate.

## CONCLUSION

FOR THE FOREGOING REASONS, Defendants' Motion for Summary Judgement is DENIED and the Defendants' Motion for Partial Summary Judgment is GRANTED.

An appropriate order shall issue.

---

[6] As part of their claims for damages, the Fenskes are requesting to be reimbursed for storage costs. However the Fenskes have offered no reason why the engineering studies could not have been moved to the storage unit and out of the Valley Road House if their primary reason for disposing of the studies was the health of their son.